59 P.3d 655 (2002)
FRATERNAL ORDER OF EAGLES, TENINO AERIE NO. 564; Kathleen L. Conner; Lanette Davis; Julia A. Foster; Gayle L. Hartman; Kaycee L. Johnson; Annette M. Riley; Diane E. Roberts; Janet Tresenriter; Alice F. Vasser; and Whidbey Island Aerie No. 3418, Petitioners,
v.
GRAND AERIE OF FRATERNAL ORDER OF EAGLES, and Washington State Aerie, Fraternal Order of Eagles Washington State Aerie, Respondents.
No. 71786-9.
Supreme Court of Washington, En Banc.
Argued June 27, 2002.
Decided December 19, 2002.
*657 Rosemary Daszkiewicz, Maryln Hawkins, Seattle, for Petitioners.
John Widell, Seattle, for Respondents.
Bruce Johnson, Jeffrey Fisher, Seattle, Amicus Curiae on behalf of Conference of Private Organizations.
Vanessa Power, Margarita Latsinova, Seattle, Terry Fromson, David Cohen, Philadelphia, PA, Amicus Curiae on behalf of Women's Law Project.
Christine Gregoire, Attorney General, Maureen Hart, Jeffrey Even, Asst. Attorneys General, Olympia, Amicus Curiae on behalf of WA State Human Rights Commission.
*656 SMITH, J.
Petitioners, two local chapters of the Fraternal Order of Eagles, Tenino and Whidbey Island Aeries, and several female members of the Tenino Aerie, ask this court to review a decision of the Court of Appeals, Division Two, which reversed a ruling of the Thurston County Superior Court that the male-only membership policy of the Grand Aerie of the Fraternal Order of Eagles barring admission of new female applicants violated the Washington Law Against Discrimination, chapter 49.60 RCW. We reverse.

QUESTION PRESENTED
The principal question presented in this case is whether the Washington Law Against Discrimination requires a "fraternal organization" to be "distinctly private" in order to qualify for exemption under the law.

STATEMENT OF FACTS
The Fraternal Order of Eagles (Eagles) was organized in this state in 1898.[1] It describes itself as a nonprofit fraternal organization with 1.6 million members worldwide.[2] Its stated purpose, according to its articles of incorporation, is to "[u]nite fraternally for mutual benefit, protection, improvement, social enjoyment and association, all persons of good moral character who believe in a Supreme Being to inculcate the principles of liberty, truth, justice and equality.... To promote and raise funds for duly authorized Fraternal Order of Eagles charities and contribute to worthwhile charitable causes."[3] The Grand Secretary of Eagles in a declaration stated the organization advances only *658 social and charitable activities and that it prohibits promotion of business or economic interests by its members.[4]
In its early history, the Eagles chartered Aeries or chapters in other states with male-only membership. It has continued growth over the years by adding chapters and members worldwide.[5] The Grand Aerie serves as the overarching governing body, creating and enforcing the organization's rules and policies. Each local Aerie must adopt the Eagles' Constitution and policies established by the Grand Aerie.[6] Each state has a State Aerie that holds meetings for discussion of policy issues prior to their annual state conventions.[7]
The Eagles traditionally restricted membership to males over 21 years of age who believe in a Supreme Being, have never been a member of the Communist party or advocated the overthrow of the government, and are of good moral character.[8] An applicant for membership must be sponsored by two members; be interviewed by a committee which recommends the applicant's approval or rejection; and be approved by a majority vote.[9] Within these broad confines, local Aeries are free to establish their own procedures for selecting new members.[10] Regular male-only meetings and gatherings are held at designated times and in accordance with the by-laws for purposes of new member initiations and the conduct of social activities.[11] At these meetings, ceremonies and prayers are performed in strict accordance with secret rituals.[12] According to an Aerie officer, the secret rituals include "mainly references to manly virtue and brotherhood as well as prayers and references to God, [which] are significant and meaningful to members of the Order."[13] Ritual competitions, he claims, are an integral part of state, regional, and national Eagle gatherings, and the presence of women would inhibit these ritual practices which are the essence of membership in the Fraternal Order of Eagles.[14]
Members in Washington State, approximating 66,000, belong to 106 local Aeries.[15] Each local Aerie has a corresponding Auxiliary, patterned after the Eagles' exclusively male orders, that admits only women.[16] Members of both the Eagles and the Auxiliary are permitted to use local Aerie facilities when available, and bring nonmember guests of either gender to the local chapter's club or social room.[17] On occasion, local Aeries rent their facilities to the public for special events.[18] In Washington, some local chapters serve lunch to members and non-members willing to pay, and hold public dances.[19] Both male and female nonmembers attend national conventions in which nonmember guest speakers participate. Local Aeries also host weekly and monthly dinners, holiday celebrations, evening activities, and civic eventssome of which are open to members, their families, guests, and, on occasion, to the public.[20]
On November 27, 1995, the judicial branch of the Eagles, the Grand Tribunal, issued its formal Opinion 750 stating that the organization's male-only membership policy was inconsistent with prevailing civil law on gender *659 discrimination.[21] Following issuance of the opinion, Respondents and other local Aeries, including Olympia, Gig Harbor, and Spokane Valley, began admitting women as members with equal membership rights and privileges.[22] At the Grand Aerie convention in July 1998, an attempt was made by motion to amend its Articles of Incorporation and Constitution to conform to the opinion of the Grand Tribunal by substituting "person" for "male" in the membership provisions. The proposed amendment was defeated.[23] The Grand Aerie subsequently withdrew Opinion 750 and issued a letter to all local chapters stating that "[a]s of July 30, 1998 it is a violation of the statutes to propose a female applicant into the Aerie...."[24] However, the letter stated that women granted Aerie membership between 1995 and 1998 retained full membership status.[25]
On July 20, 1999, by amended complaint, local Aeries, Tenino Number 564 and Whidbey Island Number 3418, and nine female members of the Tenino chapter sued the Grand Aerie in the Thurston County Superior Court, claiming that the male-only admission policy violated the Washington Law Against Discrimination (WLAD) and Washington's Equal Rights Amendment; and stating that reversing the policy would not impinge on the Eagles' right of free association.[26] Upon completion of pretrial discovery, Petitioners moved for summary judgment on the grounds that the WLAD prohibited the Eagles' gender discrimination practice in "public accommodations."[27] In response, the Grand Aerie filed a cross-motion for summary judgment, asserting that RCW 49.060.040(10) provided an absolute exemption from application of the statute for fraternal organizations such as the Eagles.[28] Respondent Eagles asserted they were covered under the language of RCW 49.60.040(10) exempting "any institute, bona fide club, or place of accommodation, which is by its nature distinctly private, including fraternal organizations."[29]
The trial court, the Honorable Richard A. Strophy, interpreted RCW 49.060.040(10) as indeed exempting "fraternal organizations" from the WLAD, but only if the organizations could prove they were "distinctly private" in nature.[30] Considering the size of the Eagles' operations and membership recruitment programs, the trial court determined the organization was "public" in nature, falling outside the exemption.[31]
In his extensive oral ruling on January 28, 2000, Judge Strophy included the following statement:
I conclude ... that "fraternity" has as much do with a shared common purpose than it does with a men's club, if you will. And so looking not only to acts and practices, but to the defendants' own literature, and listening to the arguments of counsel, I find and conclude that there are no material facts about which there's a genuine dispute regarding the FOE [Fraternal Order of Eagles]'s aggressive and wide range *660 of membership enhancement programs and goals, such that I conclude that the selectivity of membership is minimal in the Eagles.
The next factor for review by the Court in determining whether or not an organization is distinctly private is its size. Local Aeries in Washington average over 600 members. The state aeries have over 66,000. Nationally or internationally, there's approaching a million to over a million. But, certainly, the Court finds that the membership size and the membership enhancement programs are markedly different from those clubs or groups under scrutiny in the case law cited to the Court, such that in terms of considering and applying that factor, that one consideration, the size of Eagles and the local Aeries would militate against a finding that Fraternal Order of Eagles is distinctly private.
The next consideration is whether or not the community and the protected class womencan participate in activities of the organization. It is, in my assessment of the record before me, beyond cavil or genuine dispute that the Eagles are an active outreach organization in the community that involves community members to participate in projects to aid other community members who are nonmembers and involves nonmembers in the activities of the organization from time to time such that I could not, given consideration to that factor, conclude that the Fraternal Order of Eagles is distinctly private.
Another factor is how admission of women would affect the male members' rights of association. The Grand Aerie and State Aerie argue, "Well, this is a brotherhood and we have rituals, and it would significantly and adversely affect the ability of the brotherhood to maintain this close familial relationship and observe its rituals if women were admitted." Counsel has done a very good job, in my view, on this point of arguing vigorously for his clients, the Defendants Grand and State Aeries. And with all due respect to counsel in that regard, even the most skillful of us as attorneys have never been really able to make a silk purse out of a sow's ear, and on this issue, what is fatal to the Grand Aerie's position is that women have been allowed to remain. What does that say to the Aerie's intense argument that we can't be the club we want to be if we have women? If that was true and if that was a laudable and valid position, then the Grand Tribunal should not only have withdrawn its Opinion 750, but decreed that, henceforth, all current female members must be expelled and excluded to preserve this precious fraternal relationship that we must foster in order to be the organization our literature says we seek to be.
Because it is the essence of the Washington Law Against Discrimination to prohibit discrimination against persons which would deny them full enjoyment of any places of public accommodation because of gender, it does matter whether the challenged organization, even a fraternal organization, is distinctly private or not, and that consideration is more significant tha[n] whether it's composed only of men or only of women. I conclude, therefore, that, in that context, the terms "fraternal organization" and "distinctly private" are sufficiently ambiguous to warrant this court to construe the exceptionin light of the liberal purpose of the statutestrictly and in a way that reinforces accomplishment of that purpose.
And this conclusion is arrived at in light of the requirement that the Fraternal Order of Eagles Grand and State Aeries have the burden of convincing this Court that the Fraternal Order of Eagles comes within the exception. The burden is not on the plaintiffs to establish that the Grand and State Aeries are not within the exception or exemption. And if there even be that burden, the plaintiffs have sustained it.
In coming to the decision I have come to, to grant the plaintiffs' motion for summary judgment that the conduct of the Grand and State Aerie is in violation of the Washington Law Against Discrimination by restricting membership in the aeries to only males, I have not done so lightly. I have done so with the recognition that persons do have the right to associate and restrict their associations in a way that could be based upon gender or other considerations *661 such as a specific religious denomination, but that is only when they are strictly or distinctly private in activity and nature. There is nothing about the Fraternal Order of Eagles, almost a million strong across this country, that tells me that its goals, its purpose or its conduct is distinctly private. It is the opposite. And I congratulate the Eagles because of that. I think that's what makes it vital and valid and wonderful.
On March 24, 2000 the trial court granted Petitioners' summary judgment motion, concluding that the Eagles may not discriminate on the basis of gender and must admit women into membership. The court granted summary judgment to Respondent Eagles on Petitioners' claim of violation of the Equal Rights Amendment to the Washington Constitution and the Consumer Protection Act.[32]
Respondent Eagles filed a timely appeal, arguing that the trial court erred in its interpretation of the statute and in its conclusion that there remained no issue of material fact concerning the organization's public or private status.[33] On August 3, 2001 the Court of Appeals, Division Two, the Honorable C.C. Bridgewater writing, reversed the trial court, concluding that RCW 49.60.040(10) is not ambiguous and, under a literal interpretation of the statute, fraternal organizations such as Respondent Grand Aerie of the Fraternal Order of Eagles are "automatically excluded" because the wording of the statute indicates the Legislature exempted them from its application without the necessity of examining whether they are "distinctly private."[34]
Briefs amicus curiae urging reversal were filed by The Women's Law Project; Washington Women Lawyers; National Association for the Advancement of Colored People; Washington State National Organization for Women; American Association of University Women of Washington; Washington Chapter of the National Council of Jewish Women; Anti-Defamation League; California Women's Law Center; Center for Women Policy Studies; Feminist Majority and Feminist Majority Foundation; National Gay and Lesbian Task Force; NOW Legal Defense and Education Fund; Trial Lawyers For Public Justice; Women Employed; Washington State Human Rights Commission; and the Washington Attorney General.
A brief amicus curiae urging affirmance was filed by the Conference of Private Organizations.
This court granted review on April 2, 2002.

DISCUSSION
At issue in this case is the question whether the Court of Appeals erred in its reading of the Washington Law Against Discrimination to automatically exclude fraternal organizations from application of the prohibitions in RCW 49.60.040(10) and that fraternal organizations are included in the exemption for "any institute, bona fide club, or place of accommodation, which is by its nature distinctly private, including fraternal organizations."[35]
During oral argument before this court counsel for Petitioners and Respondents expressed agreement that, under the principles of summary judgment law, there remained no material fact to be determined by the trial court in this case.

WASHINGTON LAW AGAINST DISCRIMINATION
The Washington Law Against Discrimination (WLAD), originally enacted in 1949, is a broad remedial statute, the purpose of which is to prevent and eradicate discrimination on the basis of race, creed, color, national origin, sex or disability in "public accommodations."[36] The Act recognizes that the right to be free from such discrimination is a civil right enforceable in private civil actions by members of the enumerated protected *662 classes.[37] Although the rights enumerated include employment, public accommodation, assemblage and amusement, the protected rights are not limited to those.[38]
The Act created a state agency, later designated in 1971 as the Washington State Human Rights Commission, and granted it jurisdiction and powers to carry out the provisions of the Act and the "policies and practices of the commission in connection therewith."[39] The Commission is authorized to "receive, impartially investigate, and pass upon complaints alleging unfair practices" defined by the Act.[40]
"Public accommodation" is broadly defined to include:[41]
[A]ny place, licensed or unlicensed, kept for gain, hire, or reward, or where charges are made for admission, service, occupancy, or use of any property or facilities ... or where food or beverages of any kind are sold for consumption on the premises, or where public amusement, entertainment, sports, or recreation of any kind is offered with or without charge, or ... where the public gathers, congregates, or assembles for amusement, recreation, or public purposes, or public halls....
An exception to the "public accommodation" definition reads:[42]
PROVIDED, That nothing contained in this definition shall be construed to include or apply to any institute, bona fide club, or place of accommodation, which is by its nature distinctly private, including fraternal organizations, though where public use is permitted that use shall be covered by this chapter; nor shall anything contained in this definition apply to any educational facility, columbarium, crematory, mausoleum, or cemetery operated or maintained by a bona fide religious or sectarian institution;
The parties disagree on their interpretation of RCW 49.60.040(10). Respondents argue that since the language of the exception is clear and unambiguous, application of statutory construction principles to interpret it violates the well-established rule that "a statute which is clear on its face is not subject to interpretation."[43] They contend that a plain reading indicates the Legislature did not intend the phrase "which is by its nature distinctly private" to modify "fraternal organizations," and instead intended to expressly exclude all fraternal organizations regardless whether private or public.[44]
Petitioners counter with the argument that the statute is grammatically flawed, thus creating an ambiguity which requires the court to apply rules of statutory construction.[45] They claim that instead of creating a separate exception only for groups bearing the designation fraternal organization, the wording and structure of the statute indicate the Legislature intended to create two general categories of exceptions: (1) a religious entity exception and (2) a private entity exception.[46] Fraternal organizations come within the private entity exception, they assert, because to otherwise construe it creates an absurd result by allowing any group designated as a "fraternal organization" to avoid compliance with the WLAD. The WLAD, they maintain, requires that fraternal organizations be distinctly private before the exemption applies, the same requirement as that for an "institute," a "bona fide club," or a "place of accommodation."

STATUTORY INTERPRETATION
The construction of a statute is a question of law that this court reviews de *663 novo.[47] In interpreting a statute, the primary objective of the court is to ascertain and carry out the intent and purpose of the Legislature in creating it.[48] To determine legislative intent, this court looks first to the language of the statute. If the statute is unambiguous, its meaning is be derived from the plain language of the statute alone.[49]
Legislative definitions provided in a statute are controlling, but in the absence of a statutory definition, courts may give a term its plain and ordinary meaning by reference to a standard dictionary.[50] This court, however, will avoid literal reading of a statute which would result in unlikely, absurd, or strained consequences.[51] "The spirit or purpose of an enactment should prevail over ... express but inept wording."[52]
An unambiguous statute is not subject to judicial construction.[53] "A statute is ambiguous if it can reasonably be interpreted in two or more ways, but it is not ambiguous simply because different interpretations are conceivable."[54] This court is not "obliged to discern any ambiguity by imagining a variety of alternative interpretations."[55]
The first role of a court is to examine the language of a statute while adhering to the Legislature's intent and purpose in enacting it. Following that precept, the Court of Appeals used rules of punctuation and grammar in analyzing the statute to determine legislative intent. The punctuation, the court noted, sets "fraternal organizations" apart from "institute," "club," and "place of accommodation." It noted that those three terms are connected by commas and the word "or" indicating they are alternatives to each other and meant to be read together as a common idea. The Legislature, the court concluded, purposely did not include "fraternal organizations" in the list because such organizations do not share a similar connection.
The Court of Appeals indicated that the words "fraternal organizations" which separate the phrase "which is by its nature distinctly private," according to rules of grammar, is known as an adjective clause or relative clause.[56] Courts construe relative and qualifying words and phrases, both grammatically and legally, to refer to the last antecedent if a contrary intention does not appear in the statute.[57] The reason for this rule, the court noted, is to make clear what is being modified. Accordingly, the court concluded that the relative clause modifies the three antecedent nouns "institute," "club," and "place," but not "fraternal organizations" because those two words follow the clause.[58]
The Court of Appeals rejected Petitioners' argument that the word "including" brings "fraternal organizations" into the same group of words as the three antecedent nouns. Instead, the court noted the word "including" is a synonym for the word "and." Based on this grammatical analysis, the court concluded the Legislature had determined that "fraternal organizations" are "distinctly private."[59]
*664 Petitioners provide an alternative rule of grammar in response to the decision of the Court of Appeals.[60] They assert that a phrase beginning with the word "which," preceded by a comma, denotes a nonrestrictive clause.[61] They assert that a nonrestrictive clause provides "supplemental, nondefining information" that is "so loosely connected with the essential meaning of the sentence that [it] might be omitted without changing the meaning."[62] A restrictive clause, they argue, begins with the word "that," and "gives essential information about the preceding nouns." Use of the word "which," instead of the word "that," they claim, indicates the words "including fraternal organizations" were intended as nothing more than an example of the preceding words "institute, bona fide club, or place of accommodation, which is by its nature distinctively private...."[63]
The two semicolons in the "public accommodation" definition, Petitioners contend, support their claim of two exceptions and undercut Respondents' assertion that the "fraternal organizations" category stands alone as a third separate, unqualified exemption.[64] Petitioners assert that the two semicolons separate the language creating the private entities exception from the language creating the religious entities exception. They argue that setting off the words "fraternal organizations" by commas indicates they are part of the private entities exception.[65]
The statute is not necessarily ambiguous simply because of two different interpretations. The question, however, is whether those interpretations are sufficiently reasonable to warrant further inquiry. It is not always necessary to strictly adhere to technical grammatical rules in interpreting statutory provisions.[66] However, we conclude in this case that RCW 49.60.040(10) is ambiguous.[67]
Petitioners argue that because the Court of Appeals did not acknowledge ambiguity, it did not interpret the statute in accord with cases requiring courts to construe ambiguous statutes "`in a manner that best fulfills the legislative purpose and intent.'"[68]
Since the WLAD does not define "fraternal organizations" and "clubs," the words may be given their ordinary meaning by reference to a standard dictionary.[69] Both "club" and "fraternity" (from which "fraternal" is derived) are defined as an association of persons organized for a common object or purpose.[70] From this we conclude the trial court correctly determined that "club" and "fraternal organizations" are of the same nature.
Application of the ordinary meaning of the words "club" and "fraternity" to RCW 49.60.040(10), however, nevertheless still leaves a strained result. It does not seem logical that the Legislature would exempt only those groups organized for a common purpose which are distinctly private, and at the same time allow a group similarly organized for a common purpose to avoid proving *665 its private status simply by designating itself a "fraternal organization." Petitioners point out that with no legislative guidance on the distinction between the words, a conceivable risk would be that any group with malign discriminatory purposes could avoid application of the WLAD under the "fraternal organizations" exemption regardless of the group's private or public status.[71] They argue that any inconsistency in the language of the statute would be resolved by interpreting the term "fraternal organizations" as an entity exempted only if private in nature.[72]
In ascertaining legislative intent, this court resorts to legislative history, statutory construction, and relevant case law.[73]

LEGISLATIVE HISTORY
After Washington was admitted to statehood, the Legislature in 1889 enacted the State's first antidiscrimination law, a civil rights act, which granted to all persons "full and equal enjoyment of the public accommodations... applicable alike to all citizens of whatever race, color or nationality."[74] In 1895, an amendment to the act introduced the general designation of "public places."[75] The Act was later codified in 1909 and has since expanded the scope of what now constitutes places of "public accommodation."[76] Historically, the civil rights statute, as amended in 1953, RCW 9.91.010, has provided a private cause of action for damages and remedies for persons suffering discrimination because of race.[77] Although the civil rights statute in its definition of places of public accommodation similarly exempts "any institute, bona fide club, or place of accommodation, which is by its nature distinctly private," it does not include "fraternal organizations" as does the WLAD.[78] The definitions of public accommodation in the civil rights statute and the WLAD initially appear similar, but they are not in fact identical. This court distinguished the two, noting that a civil action for damages for discrimination was rarely resorted to in this state because of the preference of those suffering discrimination to avail themselves of administrative procedures provided by chapter 49.60 RCW by which persons in minority groups secured their civil rights through decrees announced in proceedings before what is now called the Human Rights Commission.[79]
In 1949, the Legislature enacted the WLAD to prevent and eliminate discrimination based on race, creed, color, or national origin in employment.[80] The general civil right prohibiting discrimination covered fewer protected classes and was limited to employment.[81] The Act also required liberal construction of its provisions to carry out its purposes and granted the State Board Against Discrimination[82] jurisdiction and powers to carry out the purposes of the *666 Act.[83] The Act, however, did not provide for private civil actions. The State Board had exclusive jurisdiction over enforcement of the Act.
The Legislature in 1957 passed House Bill 25 which rewrote the Act's definition section to include the language that "nothing herein contained shall be construed to include or apply to any institute, bona fide club, or place of accommodation, which is by its nature distinctly private, including fraternal organizations, though where public use is permitted that use shall be covered by this act."[84] The Senate amended the engrossed House Bill to add ", including fraternal organizations," following the words "distinctly private."[85]
Since its enactment, over the next five decades the scope of the Act has expanded to its current broad remedial form. The Act was amended in 1957 to provide any person the right to pursue any action or remedy for a violation of that person's civil rights.[86] In 1967, this court held that a barber shop was a place of public accommodation and the owner's refusal to provide service to an African American violated the WLAD.[87] Although the right to pursue a cause of action for violation of the general civil right to be free from discrimination and free from unfair practices was established by 1973, the jurisdiction of the Human Rights Commission continued to be limited to unfair practices.[88] The Legislature has broadened the scope of the Act by amending it to cover unfair practices in financial institutions, credit transactions, insurance transactions, and real estate transactions.[89]

LEGISLATIVE PURPOSE
The legislative purpose of the WLAD is codified in RCW 49.60.010 which provides:
This chapter shall be known as the "law against discrimination". It is an exercise of the police power of the state for the protection of the public welfare, health, and peace of the people of this state, and in fulfillment of the provisions of the Constitution of this state concerning civil rights. The legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of race, creed, color, national origin, families with children, sex, marital status, age, or the presence of any sensory, mental, or physical disability ... are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state. A state agency is herein created with powers with respect to elimination and prevention of discrimination in employment, in credit and insurance transactions, in places of public resort, accommodation, or amusement, and in real property transactions because of race, creed, color, national origin, families with children, sex, marital status, age, or the presence of any sensory, mental, or physical disability
This court has held that the purpose of the WLADto deter and eradicate discrimination in Washington[90]is a policy of the highest *667 order.[91] The WLAD contains a sweeping policy statement that strongly condemns many forms of discrimination, but does not limit its reach to employment discrimination.[92] Instead, the WLAD also guarantees the right to be free from discrimination in nonemployment matters.[93] The Legislature has progressively broadened the scope of the WLAD since its enactment, both with regard to the types of covered facilities and with regard to the protected groups. In 1973, the Legislature added discrimination on the basis of sex as one type of conduct prohibited by the WLAD.[94]
The WLAD requires liberal construction of its provisions in order to accomplish the purposes of the law and states that nothing contained in the law shall "be construed to deny the right to any person to institute any action or pursue any civil or criminal remedy based upon an alleged violation of his or her civil rights."[95] Additionally, its exceptions should be narrowly construed.[96]

OTHER JURISDICTIONS
Other states have enacted legislation similar to the WLAD.[97] Most jurisdictions follow the religious and private exemption dichotomy, and allow their courts to determine whether particular entities fit within either category.
Courts in other jurisdictions consider "fraternal organizations" within the definitional scope of "bona fide clubs" which are exempt under state and federal anti-discrimination laws if determined to be distinctly private in nature.[98] In jurisdictions where no distinction is made between fraternal organizations and clubs, both are examined under the same standards.[99] Those courts apply the same standards in determining whether an association is sufficiently private to warrant exemption under anti-discrimination laws.[100] Courts have centered their analyses on whether the group as an entity carries on commercial activities, among other factors.[101] Those groups where business conduct is prevalent are considered public in nature and subject to a state's anti-discrimination laws.[102]
Respondents contend decisions requiring clubs to admit women when the clubs' business activities are prevalent are not relevant because the special exemption of fraternal organizations is not inconsistent with our State's goal of preventing discrimination in access to business and professional, instead of merely social, opportunities. This contention, *668 however, is based upon an incorrect assumption that our Legislature has determined fraternal organizations to be private social entities when they are not engaged in any major business activity.
Examining the business character of an organization to determine whether a state's public accommodation statute applies is but one factor among several the courts consider in their analyses.[103] Two cases in other jurisdictions, United States Jaycees v. McClure and Rotary Club of Duarte v. Board of Directors of Rotary International, are consistently cited for this contention.[104] Both cases involved challenges to an organization's male-only membership policies under state anti-discrimination laws. Both state laws under review, California's Unruh Act and Minnesota's Human Rights Act, contained language prohibiting discrimination in "business establishments and facilities."
The California Court of Appeal in Board of Directors of Rotary International concluded that Rotary satisfied the definition of a business establishment because of its "businesslike attributes," which included its large staff, extensive publishing activities, and complex structure which encouraged recruitment of professionals and businessmen to generate commercial benefits among members.[105] Although the California Supreme Court denied review, the case was ultimately considered by the United States Supreme Court.[106] The Minnesota Supreme Court similarly found the Jaycees were in the business of selling goods (leadership skills) and privileges (business contacts and employment promotions) in exchange for membership dues.[107] Both cases were later appealed to the United States Supreme Court. In both Roberts v. United States Jaycees and Directors of Rotary International v. Rotary Club of Duarte,[108] the Supreme Court did not review the state law issues, but decided only whether the state laws, as applied, violated the organizations' first amendment rights to intimate or expressive association.
Within this context, the Supreme Court in Roberts v. United States Jaycees announced a list of factors to serve as a framework for distinguishing "private organizations" from "public accommodations." The factors include size, purpose, policies, selectivity, congeniality, and other characteristics pertinent to the particular case.[109] This analysis has found expression in a line of gender discrimination cases involving challenges to male-only membership policies of organizations.[110]
Like other states' public accommodation laws, the WLAD reaches the membership policies of organizations.[111] The Minnesota Supreme Court in United States Jaycees v. McClure noted the meaning of "place of public accommodation" has expanded from fixed locations to mobile sites to business facilities of any kind whose goods and privileges are made available to the public.[112] But courts have cautioned that this factor *669 alone should not be the sole basis for determining whether an organization is private in nature because business benefit might arise from any association, encounter or meeting.[113] In this case the trial court considered the claim that the Eagles' policy forbids members from promoting business interests or engaging in economic activities while participating in an Eagles activity. In oral argument counsel for Respondents carefully confined this to ritual activity only.
Other jurisdictions, while observing the "public business facility" standard, emphasize the "open invitation" standard to define a "public accommodation" and to distinguish the essential character of an organization.[114] Inquiry entails examining the selectivity of the organization in membership practices and scrutinizing whether the invitation to gather is open to the public. We agree that the factors announced in Roberts provide an appropriate foundation for determining whether the WLAD exemption under RCW 49.60.040(10) applies to the Fraternal Order of Eagles.

DETERMINING THE PRIVATE OR PUBLIC NATURE OF AN ORGANIZATION
Our case law has not identified what constitutes a "distinctly private" club. We have looked to federal cases to determine what makes a club "private" for purposes of enforcing state anti-discrimination laws.[115] Courts have found guidance from the United States Supreme Court in Roberts which announced a list of factors to be used as a framework for inquiry.[116] That list includes a query into an organization's (1) size, (2) purpose, (3) policies, (4) selectivity, (5) public services offered, (6) practices (whether women and nonmembers participate in activities and how the admission of women would affect the members' rights of association), and (7) other characteristics pertinent to a particular case.[117] Emphasis should be placed on whether the organization is a business or a commercial enterprise and whether its membership policies are so unselective and unrestricted that the organization can fairly be said to offer its services to the public.
The United States Supreme Court cases of Roberts and Rotary Club of Duarte illustrate application of the factors to cases in which the membership policies of the organizations prohibited admission of female applicants.[118] The court in Roberts found that two local chapters of the Jaycees, a nonprofit membership organization, lacked the characteristic of a distinctively private organization. In determining that Jaycees was neither small nor selective, the court considered that the two local chapters had 400 or more members; that apart from age and sex, they did not employ any criteria for judging applicants for membership; that members were routinely recruited and rarely denied membership; that although women were prohibited from voting and holding office, they attended meetings and participated in various organizational functions; and non-members of both genders regularly participated in activities, programs and recruitment meetings.[119]
Similarly, in Rotary Club of Duarte the Supreme Court concluded that Rotary membership practices lacked the selectiveness necessary to claim constitutional protection as an organization based upon a private, intimate relationship.[120] In determining that Rotary was public and not private in nature, the Court considered that club policy directed clubs to recruit a steady stream of prospects to offset attrition and to increase membership; that the purpose of Rotary was "`to produce an inclusive, not exclusive, membership,'" *670 providing the club with a cross section of the business and professional community; that service projects were undertaken to improve the standards of members' businesses and professions; and that meetings and functions were generally open to nonmembers.[121]
In this case, in reaching its conclusion that the exemption under the WLAD was unambiguous and automatically exempted fraternal organizations, the Court of Appeals examined the nature of the Eagles organization.[122] After considering the purpose, membership requirements, and operation of the Eagles, the court concluded the organization did not come within the ambit of the statutory definition of "public accommodation."[123] We do not agree with that conclusion.
Because this appeal arises from a trial court order granting summary judgment, this court reviews the order of summary judgment de novo, engaging in the same inquiry as the trial court, which is to consider all facts submitted in the record and reasonable inferences in a light most favorable to the nonmoving party.[124] Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[125] For purposes of this appeal, we review the record before the trial court to determine whether it properly considered the interrelation between the "distinctly private" factors and established facts[126] to determine if there remains any issue of material fact on the question whether the Eagles is a distinctly private organization.
In considering the purpose and selectivity of the Eagles, the trial court focused its examination on Respondents' actual practices by reviewing their literature to gain insight into membership programs and goals. The literature indicated that the Eagles support and undertake benevolent social causes and projects, and asks for membership participation in these service projects to better serve others and make their communities and countries better. The new member welcoming brochure concludes with the Eagles' slogan, "Every Member Owes at Least One New Member to His Aerie Each Year. A large membership makes it possible for us as a fraternity to give you so much for the small dues you pay." These results, the trial court concluded, undermine the contention that the Eagles is a selective social club only. Drawing inferences from these facts and arguments of counsel, the trial court concluded the Eagles was not selective in its membership practices and thus was not distinctly private.
The record indicates that the Eagles is a complex structure with distinct departments charged with particular responsibilities. The membership department has created recruitment and incentive programs to increase membership rolls.[127] To encourage membership growth, the Eagles recognize and give awards to local aeries and members for producing new members.
The record reveals facts suggesting the Eagles' membership practices are selective. In order to become a member, the candidate must be proposed for membership by two current members in good standing.[128] In *671 addition to personal sponsorship, the candidate must meet the following criteria: be a male person at least 21 years of age, be of good moral character, not be connected in any way with the Communist Party nor believe in the overthrow of government, and profess a belief in a Supreme Being.[129] Each prospective member is then interviewed and recommended by a local Aerie interviewing committee. Once recommended, a candidate for membership must be approved by a majority vote of members at an aerie meeting.
In a declaration by one of its officers, the Eagles claim they do not advertise or solicit membership at public functions.[130] Nevertheless, the trial court relied on a brochure published by Respondents and distributed for recruitment of new members to infer that the Eagles is "public" in nature.
Interpreting RCW 49.60.040(10) to unconditionally exempt groups merely designating themselves as "fraternal organizations" undermines the purpose of the WLAD to prevent and eliminate discrimination in all public settings. The WLAD should be interpreted in a manner consistent with legislative intent. Legislative intent is initially discerned from the purpose section which broadly proscribes discrimination in settings open to the public.[131] The Legislature mandated not only a liberal interpretation of the WLAD, it also intended a liberal reading of what constitutes a "public accommodation."[132] In an attempt to define "public accommodation" the Legislature provided a list of public places in general nonexclusive terms. Reading the proviso in RCW 49.60.040(10) to exclude "fraternal organizations," without determining their public, private, or religious nature, is inconsistent with the purpose of the WLAD. It is thus consistent with legislative intent to interpret the statute to exclude organizations determined to be distinctly private from the purview of the WLAD.
On the entire record before us, we conclude the conclusions reached by the trial court on the summary judgment motions were not in error.

ATTORNEY FEES
Petitioners ask for reasonable attorney fees incurred in this appeal pursuant to RAP 18.1 and RCW 49.60.030(2). We conclude they are entitled to reasonable attorney fees, the amount to be determined by the Supreme Court Clerk.[133]

SUMMARY AND CONCLUSIONS
The Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, requires a "fraternal organization" to be "distinctly private" in order to qualify for exemption under RCW 49.60.040(10).
Because this appeal arises from a trial court order granting summary judgment, this court reviews the order of summary judgment de novo, engaging in the same inquiry as the trial court, which is to consider all facts submitted in the record and reasonable inferences in a light most favorable to the nonmoving party. Summary judgment is appropriate if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Petitioners and Respondents agree there remains no genuine issue of material fact following the orders on summary judgment granted by the trial court.
Interpreting RCW 49.60.040(10) to unconditionally exempt groups merely identifying themselves as "fraternal organizations" undermines the purpose of the WLAD to prevent and eliminate discrimination in all public settings. It is consistent with legislative intent to interpret the statute to exclude distinctly private organizations from the purview of the WLAD.
Neither this court nor the Legislature has defined what constitutes a "distinctly private" club. However, the United States Supreme Court in Roberts v. United States Jaycees has announced a list of factors which *672 courts may use in determining the status of an organization: (1) size, (2) purpose, (3) policies, (4) selectivity, (5) public services offered, (6) practices, and (7) other characteristics pertinent to a particular case. These factors were relevant considerations in this case.
We conclude from the record in this case that the trial court properly granted summary judgment after concluding there remained no issue of material fact on the question whether the Fraternal Order of Eagles is a distinctly private organization and that Respondents Eagles are not entitled to exemption under the WLAD, RCW 49.60.040(10). The trial court was thus correct in concluding that Respondents Eagle may not discriminate on the basis of gender and must admit women into membership. We reverse the Court of Appeals, Division Two.
JOHNSON, IRELAND, BRIDGE, OWENS, JJ., and WEBSTER, J.P.T.
MADSEN, J. (concurring).
I agree with the majority that the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, requires a "fraternal organization" to be "distinctly private" in order to qualify for exemption under RCW 49.60.040(10). I further agree with the analysis concluding that the Fraternal Order of Eagles (Eagles) does not qualify for such exemption. I write separately, however, to address the Eagles' additional constitutional challenge that application of the WLAD to require the Eagles to admit women as members violates the current members' First Amendment rights to freely associate and to clarify that the "distinctly private" exemption in the WLAD simply embodies the constitutional standard set forth by the United States Supreme Court.
Before reaching the constitutional issue, the dissent takes the position that the WLAD is facially inapplicable to the membership policies of the Eagles calls for brief comment. In his dissent, Justice Sanders contends that membership in an organization is not a "place of public ... accommodation" under RCW 49.60.040(10), and he admonishes the majority for "not even attempt[ing] `to tie the term "place" to a physical location.' " Dissent (Sanders, J.) at 677-678 (quoting Boy Scouts of America v. Dale, 530 U.S. 640, 120 S.Ct. 2446, 2456 n. 3, 147 L.Ed.2d 554 (2000)). The majority, however, is correct in holding that the WLAD's guarantee against discrimination because of race, creed, color, national origin, sex, or ... disability applies to the Eagles as a "place of public resort, accommodation, assemblage, or amusement." RCW 49.60.030(1)(b). The definition of "place of public ... accommodation" includes membership policies of groups who extend an open invitation to the public to "gather[], congregate[], and assemble[] for amusement, recreation, or public purposes." RCW 49.60.040(10). See U.S. Jaycees v. McClure, 305 N.W.2d 764 (Minn.1981); Nat'l Org. for Women v. Little League Baseball, Inc., 127 N.J.Super. 522, 318 A.2d 33 (1974). See also Majority at 668 n.111.
The Minnesota and New Jersey Supreme Courts have recognized that "`place of public accommodation' or a `facility' is less a matter of whether the organization operates on a permanent site, and more a matter of whether the organization engages in activities in places to which an unselected public is given an open invitation." McClure, 305 N.W.2d at 773 (quoting (Little League Baseball, 127 N.J.Super. at 530-31, 318 A.2d 33)). The New Jersey Supreme Court held that membership in the Little League constitutes a "place of public accommodation" under New Jersey's Law Against Discrimination, N.J.STAT.A.N.N. § 10:5-5(l). Little League Baseball, 127 N.J.Super. at 531, 318 A.2d 33. The court explained that "[t]he statutory noun `place' (of public accommodation) is a term of convenience, not of limitation," and the "place" of public accommodation is the ball field where the children play. Id. The "agglomeration of the arrangements which Little League and its local chartered leagues ... provide" constitute the statutory example of "`accommodations, advantages, facilities and privileges'" that are provided at these places of "public accommodation." Id.; N.J.STAT.A.N.N. §§ 10:5-5, 10:5-12(f).
Since Little League conducted its activities in public places and "the invitation [was] *673 open to children in the community at large, with no restriction (other than sex)," Little League could not discriminate based on sex. Little League Baseball, 127 N.J.Super. at 531, 318 A.2d 33. Likewise, the Minnesota Supreme Court held the Jaycees as a "place of public accommodation" because the group did little screening for membership, other than sex, and did allow women to become associate members. McClure, 305 N.W.2d at 773. Thus, the Jaycees had an "open invitation to virtually anyone to become a dues paying individual or associate member." Id.
Likewise, as determined by the majority, the nonselectivity of the Eagles provides an "open invitation" to the public to become a dues paying member. The Eagles calls for widespread recruitment and a large membership base and even invites women to become Auxiliary members with use of the Eagles' facilities. The recruitment process specifically emphasizes a lack of selectivity on the part of the group, summed up in the Eagles' slogan, "Every Member OWES at Least One New Member to His Aerie Each Year[.] A large membership makes it possible for us as a Fraternity to give you so much for the small dues you pay." Majority at 670.
Moreover, the WLAD broadly defines "place of public ... accommodation," and the legislature has directed that "[t]he provisions of [chapter 49.60 RCW] shall be construed liberally for the accomplishment of the purposes thereof." RCW 49.60.020. The WLAD's proscription against discrimination "includes, but is not limited to, any place ... or use of any property or facilities," followed by a list of examples. RCW 49.60.040(10) (emphasis added). The "public place" definition, accordingly, includes application to fixed places or mobile sites occupied for public use. In this case, the "place[s] of public ... accommodation" include the local Aerie facilities, the State Aerie's meeting place, as well as all the mobile sites where the Eagles meet for activities such as the National Convention, civic and charity events, and holiday celebrations. The Eagles' activities and events constitute the statutory examples of places "where the public gathers, congregates, or assembles for amusement, recreation, or public purposes." RCW 49.60.040(10).
In sum, the Eagles invites the public to its numerous meeting and activity venues which constitute "place[s] of public ... accommodation" and render the WLAD applicable to prevent the Eagles from discriminating in its membership policies. RCW 49.60.030(1)(b),.040(10).
The majority correctly looks to federal case law in making its determination that the Eagles is not "distinctly private" to warrant exemption from the WLAD's requirements. Majority at 669-670. See Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 546, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987); Roberts v. U.S. Jaycees, 468 U.S. 609, 620, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). The majority analyzes the nature of the Eagles, whether public or private, by applying factors enumerated by the United States Supreme Court. Roberts, 468 U.S. at 620, 104 S.Ct. 3244 (noting relevant factors in determining whether a relationship is intimate or attenuated of personal attachments include size, purpose, policies, selectivity, congeniality, and other characteristics that may be pertinent).
In Roberts, however, the United States Supreme Court set out these factors to aid in its determination of whether an organization has distinctive intimate characteristics that might afford it constitutional protection of the decision of its members to exclude women. Id. at 621, 104 S.Ct. 3244. The Roberts case addresses the long established right to intimate association, embodied in the Bill of Rights' security of individual liberty. Id. at 618, 104 S.Ct. 3244. The right to intimate association affords "the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." Id. (citing e.g., Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). The protection of intimate relationships from undue intrusion by the State safeguards individual liberties. Id.
*674 The WLAD's language specifically exempting "any institute, bona fide club, or place of accommodation, which is by its nature distinctly private, including fraternal organizations" recognizes the constitutional right to intimate association afforded to such groups. RCW 49.60.040(10). The legislature exempts "distinctly private" groups from the WLAD's requirements because to apply the law to private entities constitutes undue intrusion by the State on the right to engage in intimate associations. When relationships lack an intimate nature, however, the concern of constitutional protection lessens. As the United States Supreme Court has stated:
Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments.
Roberts, 468 U.S. at 620, 104 S.Ct. 3244. The majority holds that the Eagles are not "distinctly private." Put another way, the relationships among Eagles members are not so intimate as to afford the group constitutional protection in the decision of its members to exclude women.
Although the majority does not discuss it, the Eagles raise a second argument that the Court must address: whether the application of the WLAD to compel the Eagles to accept women unconstitutionally infringes on the group's freedom of expressive association. Freedom of expressive association has long been recognized as providing individuals the "right to associate for the purpose of engaging in those activities protected by the First Amendmentspeech, assembly, petition for the redress of grievances, and the exercise of religion." Roberts, 468 U.S. at 618, 622, 104 S.Ct. 3244 (citing e.g., NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907-09, 932-33, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); Larson v. Valente, 456 U.S. 228, 244-46, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982); In re Primus, 436 U.S. 412, 426, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); Abood v. Detroit Bd. of Education, 431 U.S. 209, 231, 97 S.Ct. 1782, 1797, 52 L.Ed.2d 261 (1977)). The First Amendment rights could not be "vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." Roberts, 468 U.S. at 622, 104 S.Ct. 3244.
The Eagles pursue a wide variety of social, cultural, and religious ends. The group's stated purpose is to:
Unite fraternally for mutual benefit, protection, improvement, social enjoyment and association, all persons of good moral character who believe in a Supreme Being to inculcate the principles of liberty, truth, justice and equality.... To promote and raise funds for duly authorized Fraternal Order of Eagles charities and contribute to worthwhile charitable causes.
Clerk's Papers at 866. The activities and objectives of the Eagles implicate freedom of speech, assembly, and the exercise of religion. Thus, the WLAD's requirement that the Eagles admit women works as state interference with the group's organizational structure and affairs. See Roberts, 468 U.S. at 623, 104 S.Ct. 3244 (holding no clearer example of intrusion into the internal structure or affairs of a group than a regulation that forces the group to accept members it does not desire). The Court must determine whether requiring the Eagles to admit women may impair the members in their expression of viewpoints and endeavors.
The United States Supreme Court has announced the following test for determining whether State action violates the right of expressive association:
Infringements on [the right to expressive association] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.
Roberts, 468 U.S. at 623, 104 S.Ct. 3244. Thus, the First Amendment right to expressive association is not without limits.
Washington certainly has a compelling interest in deterring and eradicating discrimination, and we have held the purpose of the WLAD as a policy of the highest order. *675 Allison v. Hous. Auth. of City of Seattle, 118 Wash.2d 79, 86, 821 P.2d 34 (1991); see also Majority at 666-667 nn.90-91. Furthermore, the WLAD's goal of preventing and ending discrimination on the basis of "race, creed, color, national origin, sex, or ... disability" in "place[s] of public ... accommodation" does not relate to the suppression of ideas, nor does the WLAD impose any serious burden on the members' freedom of expressive association. RCW 49.60.030(1)(b), .040(10).
It is most persuasive that the Eagles opened membership to women from 1995-1998 and allowed all women admitted during that time period to retain their memberships after closing membership to women once again in 1998. The action exemplifies that the presence of women does not hinder the ability of the Eagles to engage in protected activities or to disseminate the groups' preferred views. The imposition of the WLAD to require the Eagles to admit women does not pose a change to the organization's stated purpose, infra p. 679; nor does it restrict the Eagles' ability to exclude individuals who do not support these stated ideologies. Furthermore, even if application of the WLAD infringes in some part on the Eagles' protected First Amendment rights, the WLAD's proscriptions are no greater than is necessary to accomplish Washington's compelling interest in eradicating discrimination.
For these reasons, I would hold that the Eagles members' right to expressive association is not violated by application of the WLAD to require the organization to admit women members.
JOHNSON, J., concurs.
ALEXANDER, C.J. (dissenting).
The majority indicates that the principal issue in this case is whether an organization must be "`distinctly private'" in addition to being "`fraternal,'" in order to be exempt from Washington's Law Against Discrimination (WLAD). Majority at 657. I agree that this is the central question before us. I also agree with the majority that "to unconditionally exempt groups merely identifying themselves as `fraternal organizations' undermines the purpose of the WLAD." Majority at 671. In that regard, I am in accord with the trial court and disagree with the Court of Appeals and Justice Sanders's dissent. Where I differ with the majority is in its holding that there is no genuine issue of material fact on the issue of whether the Eagles is a "distinctly private" organization, and that petitioners are, therefore, entitled to judgment as a matter of law.
A grant of summary judgment is appropriate only when the submissions to the court show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). "`A material fact is one upon which the outcome of the litigation depends in whole or in part.'" Samis Land Co. v. City of Soap Lake, 143 Wash.2d 798, 803, 23 P.3d 477 (2001) (citations omitted). On review of a summary judgment, the appellate court engages in the same inquiry as the trial court. Harris v. Ski Park Farms, Inc., 120 Wash.2d 727, 737, 844 P.2d 1006 (1993) (citing Marincovich v. Tarabochia, 114 Wash.2d 271, 787 P.2d 562 (1990)). The court must consider the facts submitted and all reasonable inferences in the light most favorable to the nonmoving party and the motion should be granted only if, from all of the evidence, reasonable persons could reach but one conclusion. Because the petitioners, the Tenino and Whidbey Island Aeries of the Fraternal Order of Eagles and the female members of the Tenino Aerie, prevailed on their motion for summary judgment, the Grand Aerie of the Fraternal Order of Eagles must be deemed the nonmoving party.
The Court of Appeals concluded that simply because the Fraternal Order of Eagles is a fraternal organization, it was "`distinctly private'" and, thus, "excluded" from the operation of WLAD in places of "`public accommodation.'" Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie, Fraternal Order of Eagles, 108 Wash.App. 208, 217, 27 P.3d 1254 (2001). As noted above, I agree with the majority that this was error. I do not, however, believe that we should, as the majority does, reverse the Court of Appeals and reinstate the decision of the trial court. We should instead remand for a trial.
*676 I believe this case must go to trial because the question of whether the Fraternal Order of Eagles is or is not a distinctly private organization is a factual question that cannot be resolved on the record before us. Summary judgment is, therefore, not appropriate. The majority buttresses its determination that the trial court properly granted summary judgment to petitioners by saying, "Petitioners and Respondents agree there remains no genuine issue of material fact following the orders on summary judgment granted by the trial court." Majority at 676. While the parties may agree on the supporting facts to be examined according to the criteria set forth in Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), they most certainly do not agree on the inferences that may be drawn from these facts.
In concluding that the Eagles is not a distinctly private organization, the majority looks favorably on the facts the trial court focused on when it concluded that the Eagles is not a distinctly private organization. In that regard, the trial court indicated that the literature of the Fraternal Order of Eagles revealed that the Eagles support and undertake benevolent social causes and projects, and asks its members to participate in these projects in order to serve others and make the community and nation a better place. The record also indicates that the Eagles new member welcome brochure concludes with the statement, "`Every Member Owes at Least One New Member to His Aerie Each Year[.]' ... A large membership makes it possible for us as a Fraternity to give you so much for the small dues you pay." Clerk's Papers at 706. The submissions also show that to encourage membership, the Grand Aerie of the Fraternal Order of Eagles recognizes and gives awards to local Aeries and individual members for bringing in new members. These facts, according to the trial court, undermine the contention that the Eagles is a selective fraternal organization.
On the other hand, the submissions before the trial court reveal that the membership practices of the Eagles are somewhat selective. In order to become a member, a candidate must be proposed by two current members who are in good standing. In addition, the candidate for membership must be a male person and at least 21 years of age, of good moral character, not connected in any way with the Communist party nor believe in the overthrow of government. The candidate must also profess a belief in a supreme being. Furthermore, each prospective member must be interviewed by an interviewing committee, which may or may not recommend the candidate for membership. Candidates who are recommended for membership gain membership only if their membership application receives a majority vote of the members of the Aerie in attendance at the meeting at which the membership application is considered. The Grand Aerie declared in a submission of one of its officers that the Eagles do not advertise or solicit members at public functions. Once an applicant for membership gains entry to the Eagles, he may attend lodge meetings at which ceremonies and prayers are performed in accordance with secret rituals.
In my view, reasonable minds could differ as to what inferences flow from the submissions presented to the trial court. While one can certainly mount a credible argument that the aforementioned facts are susceptible only to a conclusion that the Eagles is not a distinctly private organization, one can mount a reasonable argument contrary to that position. Indeed, respective counsel, though agreeing that the facts were not disputed, vehemently disagreed as to what conclusions could be drawn from these facts. In light of the fact that the record must be viewed most favorably to the Grand Aerie of the Fraternal Order of Eagles, all reasonable inferences must favor its position that the Eagles is a distinctly private fraternal order. The factual issue of whether the Eagles is or is not a distinctly private fraternal organization was, therefore, not properly determined on summary judgment.
In sum, after reviewing all facts in the record, and drawing reasonable inferences in a light most favorable to the nonmoving party, the Grand Aerie of the Fraternal Order of Eagles, I conclude that there remains a genuine issue of material fact that can be resolved *677 only by the trial judge or a jury after a trial. At a trial the focus should be on the factors the United States Supreme Court identified in Roberts, 468 U.S. 609, 104 S.Ct. 3244, in determining if the Fraternal Order of Eagles has the characteristics of that distinctly private organization. I would, therefore, remand the case to the trial court for that determination. Because the majority does otherwise, I dissent.
SANDERS, J. (dissenting).
The legal questions are whether the sexually discriminatory membership criteria of the Fraternal Order of Eagles is covered by Washington's law against discrimination (WLAD) pursuant to RCW 49.60.040(10) as a "place" of public accommodation and, if so, whether the Eagles is exempt from that statute as a fraternal organization.
If the statute is unambiguous, its meaning must be derived solely from the statutory language. In re Pers. Restraint of Lehman, 93 Wash.2d 25, 27, 604 P.2d 948 (1980). Resort to other tools of statutory construction, including consideration of legislative history, is improper. Cherry v. Muni. of Metro. Seattle, 116 Wash.2d 794, 799, 808 P.2d 746 (1991). "[W]hen the language of a statute is plain and free from ambiguity, it must be held to mean exactly what it says." Shelton Hotel Co. v. Bates, 4 Wash.2d 498, 507, 104 P.2d 478 (1940). Put differently, when the statute is unambiguous the statute speaks for itself. See Parkhurst v. City of Everett, 51 Wash.2d 292, 294, 318 P.2d 327 (1957) ("If the words employed in the declaring part of a statute be plain, unambiguous, and well understood according to their natural and ordinary sense and meaning, the statute furnishes a rule of construction beyond which a court cannot go.") (citing Tsutakawa v. Kumamoto, 53 Wash. 231, 101 P. 869, 102 P. 766 (1909)).
WLAD, chapter 49.60 RCW, guarantees the right to be free from discrimination because of sex in "any place of public ... accommodation." RCW 49.60.030(1)(b). See also RCW 49.60.215 (making it an unfair practice to refuse admission into places of public accommodation on the basis of sex). RCW 49.60.040(10) defines the phrase "any place of public ... accommodation" as:
[A]ny place, licensed or unlicensed, ... where charges are made for admission, service, occupancy, or use of any property or facilities, whether conducted for the entertainment, housing, or lodging of transient guests, ... or where food or beverages of any kind are sold for consumption on the premises, or where public amusement, entertainment, sports, or recreation of any kind is offered with or without charge, ... where the public gathers, congregates, or assembles for amusement, recreation, or public purposes.... PROVIDED, That nothing contained in this definition shall be construed to include or apply to any institute, bona fide club, or place of accommodation, which is by its nature distinctly private, including fraternal organizations, though where public use is permitted that use shall be covered by this chapter.
RCW 49.60.040(10) (emphasis added).
I posit the policy of the Eagles, which limits eligible membership to males of good moral character, not connected or affiliated with the Communist Party, not believing in the overthrow of the government, recommended by two preexisting members, and accepted by the existing members, does not violate this statute and, even if it did, the Eagles' First Amendment right of free association might well be violated.

Membership Criteria are not a Place
This statute is facially inapplicable to Eagles membership policies because the Eagles is not a "place." Our past decisions concerning a "place of public accommodation" suggest WLAD applies only to admission into physical places that constitute places of public accommodation, such as barber shops, In re Johnson, 71 Wash.2d 245, 252, 427 P.2d 968 (1967); cf. Browning v. Slenderella Sys. of Seattle, 54 Wash.2d 440, 445, 341 P.2d 859 (1959) (concluding a salon is a place of public accommodation as defined by the public accommodation law, RCW 9.91.010), overruled in part on other grounds by Nord v. Shoreline Sav. Ass'n, 116 Wash.2d 477, 805 P.2d 800 (1991), the facilities of public transit authorities, Fell v. Spokane Transit Auth., 128 *678 Wash.2d 618, 638, 911 P.2d 1319 (1996), parks and public resorts, see Davis v. Tacoma Ry. & Power Co., 35 Wash. 203, 204, 207, 77 P. 209 (1904), and movie theaters, see Anderson v. Pantages Theatre Co., 114 Wash. 24, 27-28, 194 P. 813 (1921), Randall v. Cowlitz Amusements, 194 Wash. 82, 84, 76 P.2d 1017 (1938). The definition of "any place of public... accommodation" in RCW 49.60.040(10) does not fit admission to the membership of an organization. The majority does not even attempt "to tie the term `place' to a physical location." Cf. Boy Scouts of Am. v. Dale, 530 U.S. 640, 657, 120 S.Ct. 2446, 2456, 147 L.Ed.2d 554, id. at n. 3, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000).
Nevertheless the majority asserts, without analysis, "the WLAD reaches the membership policies of organizations." Majority at 668. RCW 49.60.040(10) defines which physical locations constitute "[a] place of public... accommodation" to which persons must be allowed access without consideration of sex, race, nationality, etc. See RCW 49.60.040(10); .030(1)(b); .215. That definition includes "any place, licensed or unlicensed" and provides an extensive list of such places. RCW 49.60.040(10). It lists various examples of physical locales such as facilities for entertainment, housing, health services, or the sale of goods or rendering of personal services, stations, terminals and garages, halls, elevators, washrooms, educational institutions, and schools. Id. Although the definition does embrace facilities "where the public gathers, congregates, or assembles for amusement, recreation, or public purposes," not once does it refer to membership of any organization gathering, congregating, or assembling in such facilities. In short, the WLAD concerns the right to admission into places of public accommodation, not admission into the membership of any organization operating a place of public accommodation. See Fell, 128 Wash.2d at 638, 911 P.2d 1319 (noting RCW 49.60.040(10) embraces only admission into "places and facilities") (emphasis added).

Fraternal Organizations are Exempt from its Scope
Even if membership practices are a "place," the statute expressly exempts "fraternal organizations" from its scope. Although all concede the Fraternal Order of Eagles is a "fraternal organization," the majority conjures an ambiguity, see majority at 664-665 (concluding RCW 49.60.040(10) is ambiguous), and then construes the statute to reach its desired result.
At the outset I disagree with the majority's conclusion this statute is ambiguous for the reasons articulated by the Court of Appeals.
First, we note that "fraternal organizations" is set apart from "institute," "club," and "place of accommodation" within the statute. It is plain that this list of three nouns (i.e., "institute, club, or place") is intended to be read together because they are connected by the word "or," which is a function word indicating that they are alternatives to each other. Thus, the three nouns are connected by some common idea.
Second, "fraternal organizations" is set apart from the three nouns by the adjective clause (also known as a "relative clause"): "which is by its nature distinctly private." Adjective clauses are to immediately follow the noun or nouns that they modify.
The reason for this rule is so that it will be clear what is being modified. Clearly, the series of nouns ("institute, club, or place") are modified by this adjective clause and "fraternal organizations" is not. By this sentence construction we can clearly understand what the common idea is that connects those three entities togethera nature that may be "distinctly private." That is to say, these entities either fit within the definition of being "distinctly private" or they are "public." Plainly, "fraternal organizations" is not modified by this adjective clause. It would have been a simple task for the legislature to include "fraternal organizations" in its list and it did not.

Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie, Fraternal Order of Eagles, 108 Wash.App. 208, 216-17, 27 P.3d 1254 (2001), review granted, 145 Wash.2d 1033, 43 P.3d 20 (2002) (citations omitted) *679 (emphasis added). This analysis is faithful to the plain text of the statute.
The Court of Appeals continued:
[Petitioners assert] that the word "including" brings "fraternal organizations" within the list of the three nouns. But, read in the context of the statute, "including" is a synonym for the word "and." "Including" brings "fraternal organizations" within the list separated by the adjective clause. By use of this language, the legislature already determined that fraternal organizations are, by their very nature, "distinctly private."
We conclude that fraternal organizations are automatically excluded from the statute's operation.... But for those limited occasions when the organization acts like a public accommodation (e.g., serving lunches, holding public dances, or renting facilities for events), the legislature has provided that it shall be "covered by this chapter." RCW 49.60.040(10) ("though where public use is permitted that use shall be covered by this chapter"). Therefore, there is no need for FOE to prove it is "distinctly private"; fraternal organizations do not come within the ambit of "public accommodations." The statute is unambiguous; this proviso exempts fraternal organizations from the statute's application without having to examine whether they are "distinctly private."
The trial court erred....

Fraternal Order of Eagles, 108 Wash.App. at 217, 27 P.3d 1254 (footnote omitted). Again, I agree.
Since petitioners do not dispute the Fraternal Order of Eagles is in fact a fraternal organization, that should end the case.
In summary, the membership policies of the Eagles are not covered by this statute, and, even if they were generally within the statutory scope, the Eagles is exempt from coverage of the WLAD as a matter of law. I would therefore hold the trial court erred when it (1) denied the Eagles' motion to dismiss and (2) granted petitioners' motion to impose liability.

Distinctly Private
Unfortunately, instead of abiding by the plain language of RCW 49.60.040(10) the majority accepts the trial court's conclusion that "club" and "fraternal organizations" are the same. Majority at 664. The majority's construction, equating "fraternal organizations" with "club" and then requiring fraternal organizations to establish they are "distinctly private" to qualify for the exemption, violates at least three canons of construction.
First, "[w]hen the Legislature uses different words in the same statute, it usually means it intended the words to have different meanings." State v. Keller, 143 Wash.2d 267, 278, 19 P.3d 1030 (2001), cert. denied, 534 U.S. 1130, 122 S.Ct. 1070, 151 L.Ed.2d 972 (2002). Although the inclusion of different words does not always mean they have different meanings, see id. at 278-79, 19 P.3d 1030, the majority opinion does not explain why the legislature included both "club" and "fraternal organizations" in the text if the two were intended to mean the same. Moreover, the majority does not explain why the legislature placed the two words in different locations. While the word "club" is listed in conjunction with two other forms of organizations, "fraternal organizations" is located separately and alienated from the others by the clause "which is by its nature distinctly private."
The majority's conclusion "club" and "fraternal organizations" are the same is primarily based on the similarities in their alternative dictionary definitions. But comparison of these definitions conveniently omits the differences. A more complete dictionary definition of "club" is as follows:
club ... 2 b (1): an association of persons for social and recreational purposes or for the promotion of some common object (as literature, science, political activity) usu. jointly supported and meeting periodically, membership in social clubs usu. being conferred by ballot and carrying the privilege of use of the club property ... c obs: a set or group of persons having common opinions or aims ... e: a commercial establishment serving food and liquor and often featuring music, dancing, or other entertainment: NIGHTCLUB ...f: an amateur *680 or professional athletic organization devoted to a particular sport[.]
WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 430 (1986). Thus, while "an association of persons organized for a common object or purpose" may be a definition of "club," majority at 664, it is not the only definition. The shortcomings of the majority opinion become even more apparent when one compares the above definition to a more complete dictionary definition of "fraternal" and "fraternity":
fraternal . . . 1 a: of, relating to, or involving brothers ... b: of, relating to, or being a fraternity or confederation ... c: of, relating to, or being one of many men's or sometimes women's clubs or associations usu. having secret rites, restricted memberships, and religious, social, charitable, or professional purposes[.]
fraternity . . . 1: a group of people associated or formally organized for a common purpose, interest, or pleasure: as a: a religious or ecclesiastical brotherhood b: a usu. organized group of men of the same class, occupation, interest, or purpose : COMPANY, GUILD : fraternal order[.]
WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 903 (1986). A fraternal organization may be a type of club; one usually having secret rituals, restricted membership, etc. "Club" is broader than "fraternal organizations," the former encompassing the latter.
Second, statutes must be construed so as not to render any language superfluous. Fray v. Spokane County, 134 Wash.2d 637, 648, 952 P.2d 601 (1998). If "fraternal organizations" means the same as "club," then the phrase "including fraternal organizations" would be redundant. Therefore, to avoid redundancy we must begin with the assumption the two terms are not the same.[1]
Third, Keller reaffirmed that our starting point is to "assume the Legislature means exactly what it says." 143 Wash.2d at 276, 19 P.3d 1030. Here, however, the majority's conclusion that fraternal organizations must establish their distinctly private nature to qualify for an exemption assumes the legislature meant something other than what it said.
The majority claims RCW 49.60.040(10) is ambiguous because it is ineptly worded and enforcement of its plain language would lead to an illogical result: that some groups organized for a common purpose would be exempt only if they can show they are distinctly private whereas other groups organized for a common purpose would not be so required. Majority at 663, 665 ("`The spirit or purpose of an enactment should prevail over... express but inept wording'") (citing State v. Day, 96 Wash.2d 646, 648, 638 P.2d 546 (1981)). I disagree. A statute is not ineptly worded merely because a judge personally disagrees with the result it dictates. There is no need for such organizations to present evidence of their distinctly private nature to qualify for the exemption. The Court of Appeals also noted, "the legislature already determined that fraternal organizations are, by their very nature, `distinctly private,'" if such characterization indeed be necessary. Fraternal Order of Eagles, 108 Wash.App. at 217, 27 P.3d 1254.
The majority also claims RCW 49.60.040(10) must be judicially rewritten because enforcing it as written would lead to a politically incorrect result. See majority at 665. But the personal views of judges about the Eagles' all-male membership policy are not relevant to determine whether the statutory definition of "any place of public ... accommodation" is ambiguous. Not only is the WLAD not directed against unpleasantness per se, Kahn v. Salerno, 90 Wash.App. 110, 118, 951 P.2d 321 (1998), but the ambiguity of a statute is distinct from its political *681 consequences. The test to determine whether a statute is ambiguous looks to the text and asks whether it can be subjected to two or more reasonable interpretations. State v. McGee, 122 Wash.2d 783, 787, 864 P.2d 912 (1993).
The majority's suggestion that enforcing RCW 49.60.040(10) as written would lead organizations to designate themselves as fraternal so they might freely discriminate assumes self-designation ends the inquiry. See majority at 671. However whether an organization qualifies as a fraternal organization is a judicial question to be resolved on the facts of the case. I therefore agree with the majority that merely designating an organization as a fraternal organization by creative naming is insufficient to escape requirements of the WLAD which are otherwise applicable. See majority at 671. The proper focus is on the realities of the organization. If an organization operates as a fraternal organization, we call it what it is: a fraternal organization. Moreover, to the extent fraternal organizations allow their facilities to be used by the general public, that use is covered by the WLAD. See RCW 49.60.040(10) ("though where public use is permitted that use shall be covered by this chapter").
Last, even if RCW 49.60.040(10) could be construed to exempt fraternal organizations only if proved to be "distinctly private," the Fraternal Order of Eagles is just that. "Distinctly private" is not defined in the statute. "In the absence of a statutory definition, we will give the term its plain and ordinary meaning ascertained from a standard dictionary." State v. Sullivan, 143 Wash.2d 162, 175, 19 P.3d 1012 (2001) (footnote omitted); cf. majority at 663.
The dictionary definition of "private" is:
private . . . apart from the state, deprived of office, of or belonging to oneself ... 1 a: intended for or restricted to the use of a particular person or group or class of persons : not freely available to the public[.]
WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1804 (1986) (emphasis added). The Fraternal Order of Eagles is certainly separate from the state, and its membership is limited to a particular group of persons. In fact, that is the objection! Thus, even under the majority's reading of RCW 49.60.040(10), the Fraternal Order of Eagles is exempt.

Roberts Factors
Although this is a case of first impression requiring us to determine the meaning of a state statute and then apply it accordingly, I find the majority's citation to United States Supreme Court cases discussing the First Amendment right of association mystifying and inaccurate.
For example, the majority states,
Within this context, the Supreme Court in Roberts v. United States Jaycees [468 U.S. 609, 620, 104 S.Ct. 3244, 3251, 82 L.Ed.2d 462 (1984)] announced a list of factors to serve as a framework for distinguishing "private organizations" from "public accommodations." The factors include size, purpose, policies, selectivity, congeniality, and other characteristics pertinent to the particular case.
Majority at 668-669. Noticeably the majority encloses the words "private organizations" and "public accommodations" within quotations marks to seemingly suggest it is actually quoting from that portion of the Roberts opinion which enumerates various factors to be considered for this purpose. In point of fact, however, the text does not seek to distinguish between "private organizations" and "public accommodations" but rather presents a spectrum of personal associations between the poles of family relationships at one extreme and large business enterprises at the other, suggesting the First Amendment right of free association is more applicable to the former than the latter. All of these associations are, however, distinctly private, and there is no assertion in the opinion to the contrary.
The majority opinion is also remarkable for its failure to cite the most recent United States Supreme Court case culminating this line of authority: Boy Scouts of Am. v. Dale, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). There the United States Supreme Court found First Amendment associational protection prevailed over the New Jersey statute which prohibited discrimination on *682 the basis of sexual orientation. Although this was a five to four decision with multiple opinions, there is nothing in any of them to suggest that any of the so-called Roberts factors involving the size of the organization (about one million American Boy Scouts in 1992), as well as its practice of public recruitment and liberal standards for membership admission, in any way diminished its First Amendment associational claim of the Scouts.
I posit these federal cases have nothing to do with a proper understanding of our state statute but, even if they did, they lend no support to the majority's claim that Eagles is not "distinctly private." Nor do I find the majority's analysis on this point compelling, or even present. In point of fact, the majority, while sustaining this summary judgment, concludes "[t]he record reveals facts suggesting the Eagles' membership practices are selective." Majority at 670. If selectivity is a criteria, is not evidence of selectivity evidence this criteria has been met rendering summary judgment improper? I must ask, what is it, in particular, about the Eagles which, in the view of the majority, requires this private association be classified "public" as a matter of law? Enquiring minds want to know.
The majority's discussion of the First Amendment associational cases (particularly when supplemented with the recognition of the Boy Scouts case) does, however, highlight the significant constitutional question of whether application of Washington's Law Against Discrimination to the membership practices of the Eagles violates their First Amendment right to freely associate. That, I suppose, may be the next case; however, suffice to say the majority's strained statutory construction has created a constitutional problem which would be completely avoided were the result otherwise. This approach is inconsistent with the rule that we must construe statutes in a constitutional fashion where reasonably possible to do so. State v. Rohrich, 132 Wash.2d 472, 476, 939 P.2d 697 (1997).
The Court of Appeals correctly held the WLAD exempts fraternal organizations without any further requirement to show they are "distinctly private," even assuming their membership practices are within the scope of the act at all. Fraternal Order of Eagles, 108 Wash.App. at 217, 27 P.3d 1254. Moreover, and in any event, the Fraternal Order of Eagles is, in fact, distinctly private. I dissent.
NOTES
[1] Clerk's Papers at 866. The Fraternal Order of Eagles was founded on February 6, 1898 in Seattle originally as the Order of Good Things, later changing to its current name.
[2] Id. at 786.
[3] Id. at 644.
[4] Id. at 596.
[5] Id. at 597, 866.
[6] Id. at 636.
[7] Clerk's Papers at 748.
[8] Id. at 669.
[9] Id. at 597.
[10] Clerk's Papers at 638.
[11] Id. at 935-36.
[12] Id. at 598.
[13] Id.
[14] Id.
[15] Id. at 747.
[16] Clerk's Papers at 866.
[17] Id. at 598, 647.
[18] Id. at 598.
[19] Id. at 153-54.
[20] Id. at 152.
[21] Id. at 819. Opinion Number 750 reads in pertinent part:

Our review of relevant civil cases, involving not only the Fraternal Order of Eagles, but other private organizations confirms that the Courts have consistently upheld legislation designed to prevent discriminatory membership policies in private clubs when such policies are based solely on gender. Given these interpretations, our fraternal laws must then yield to prevailing civil law.
It is the opinion of the Grand Tribunal that the use of the word `male' appearing at Section 70.2 of the Statutes is not consistent with prevailing civil law. This prevailing civil law takes precedent over our laws on this subject. The Grand Aerie will impose no restrictions upon membership in the Local Aerie, on the basis of gender. To the extent that prior Opinions 698, 698-A and 700 are inconsistent herewith, they are expressly overruled.
[22] Clerk's Papers at 639.
[23] Id. at 821-22.
[24] Id. at 825.
[25] Id. at 823.
[26] Id. at 569-79, 1016-23.
[27] Id. at 569-79, 1016.
[28] Clerk's Papers at 580-94.
[29] RCW 49.60.040(10).
[30] Pet. for Review at App. C.
[31] Id.
[32] Id. at 71-74.
[33] Br. of Appellant at 2.
[34] Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie, Fraternal Order of Eagles, 108 Wash.App. 208, 217, 27 P.3d 1254 (2001).
[35] Id.; RCW 49.60.040.
[36] Marquis v. City of Spokane, 130 Wash.2d 97, 109, 922 P.2d 43 (1996); RCW 49.60.010.
[37] RCW 49.60.030.
[38] See RCW 49.60.030(1).
[39] RCW 49.60.120(3); See Phillips v. City of Seattle, 111 Wash.2d 903, 908, 766 P.2d at 1099 (1989). RCW 49.60.050.051, -120(3).
[40] RCW 49.60.120(4).
[41] RCW 49.60.040(10).
[42] Id. (emphasis added).
[43] Br. of Appellant at 12-14 (quoting Marquis, 130 Wash.2d at 108, 922 P.2d 43).
[44] Id. at 12-16.
[45] Br. of Resp'ts at 17-24.
[46] Id. at 18-20.
[47] State v. Keller, 143 Wash.2d 267, 276, 19 P.3d 1030 (2001); Rettkowski v. Dep't of Ecology, 128 Wash.2d 508, 514-15, 910 P.2d 462 (1996).
[48] State v. Sullivan, 143 Wash.2d 162, 174-75, 19 P.3d 1012 (2001); State v. Chester, 133 Wash.2d 15, 21, 940 P.2d 1374 (1997).
[49] Keller, 143 Wash.2d at 276, 19 P.3d 1030.
[50] Sullivan, 143 Wash.2d at 174, 19 P.3d 1012.
[51] State v. McDougal, 120 Wash.2d 334, 350, 841 P.2d 1232 (1992).
[52] State v. Day, 96 Wash.2d 646, 648, 638 P.2d 546 (1981).
[53] Keller, 143 Wash.2d at 276, 19 P.3d 1030.
[54] Id.
[55] Id. at 277, 19 P.3d 1030.
[56] Fraternal Order of Eagles, Tenino Aerie No. 564, 108 Wash.App. at 214-16, 27 P.3d 1254 (citing Caughey v. Employment Sec. Dep't, 81 Wash.2d 597, 602, 503 P.2d 460 (1972)).
[57] In re Application of Andy, 49 Wash.2d 449, 302 P.2d 963 (1956); see, e.g., Caughey, 81 Wash.2d at 602, 503 P.2d 460 ("[W]here no contrary intention appears in a statute, relative and qualifying words and phrases refer to the last antecedent.").
[58] Fraternal Order of Eagles, Tenino Aerie No. 564, 108 Wash.App. at 215, 27 P.3d 1254.
[59] Id.
[60] Resp't's Mot. for Recons. at 7.
[61] Id. at 7 (citing Brian A. Garner, A DICTIONARY OF MODERN AMERICAN USAGE, 648 (1998)).
[62] Id. at 8.
[63] Id. at 7.
[64] Br. of Resp't at 21-22.
[65] Id.
[66] Duke v. Johnson, 123 Wash. 43, 49, 211 P. 710 (1923).
[67] Keller, 143 Wash.2d at 276, 19 P.3d 1030.
[68] State ex rel. Royal v. Bd. of Yakima County Comm'rs, 123 Wash.2d 451, 459, 869 P.2d 56 (1994) (quoting In re Marriage of Kovacs, 121 Wash.2d 795, 804, 854 P.2d 629 (1993)).
[69] Cockle v. Dep't of Labor & Indus., 142 Wash.2d 801, 808, 16 P.3d 583 (2001).
[70] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 430, 930 (3d ed.1993) defines "club" as "an association of persons for social and recreational purposes or for the promotion of some common object...." "Fraternal" is defined as "of, or relating to, or being a fraternity...." "Fraternity" is defined as "a group of people associated or formally organized for a common purpose, interest, or pleasure as ... [a] fraternal order...."
[71] Resp'ts' Mot. for Recons. at 22-23.
[72] Platt Elec. Supply, Inc. v. City of Seattle, 16 Wash.App. 265, 277, 555 P.2d 421 (1976), review denied, 89 Wash.2d 1004 (1977).
[73] Cockle, 142 Wash.2d at 808, 16 P.3d 583.
[74] Powell v. Utz, 87 F.Supp. 811,815 (E.D.Wash. 1949).
[75] Id.
[76] Id.; see also Browning v. Slenderella Sys. of Seattle, 54 Wash.2d 440, 445-46, 341 P.2d 859 (1959) (holding a beauty salon's discrimination of an African American because of her race violated the public accommodation laws; also noting that in reenacting the 1909 public accommodation act, the Legislature added an additional subsection expanding the meaning of "public accommodation" to remove judicial limitations placed on the act in this court's decisions in Goff v. Savage, 122 Wash. 194, 210 P. 374 (1922) (holding that a soda fountain in a drugstore was not a place of public accommodation); and Finnesey v. Seattle Baseball Club, 122 Wash. 276, 210 P. 679 (1922) (holding a baseball park was not a place of public accommodation)).
[77] Browning, 54 Wash.2d at 445-46, 341 P.2d 859.
[78] See RCW 9.91.010(1)(d); RCW 49.60.040(10).
[79] Browning, 54 Wash.2d at 446, 341 P.2d 859.
[80] Marquis v. Spokane, 130 Wash.2d at 105-06, 922 P.2d 43.
[81] See Laws of 1949, ch. 183, § 12.
[82] The Washington State Board Against Discrimination was renamed the Washington Human Rights Commission in 1971. RCW 49.60.051.
[83] See Laws of 1949, ch. 183, §§ 1,4.
[84] See Washington Law Against Discrimination, Laws of 1957, ch. 37, § 4; H.B. 25, 1957 Leg., 35th Leg., Reg. Sess. (Wash.1957). On February 7, 1957, in the second reading of the H.B. 25, the Judiciary Committee recommended that the Bill pass with the following amendment: "In section 15, page 9, lines 26 and 27 of the original bill ... after the word `religious `and before the word `sectarian `strike the word `or `and insert in lieu thereof a comma (,); and after the word `institution `and before the word `from `insert the following:', or fraternal organizations.'"
[85] H.B. 25, 1957 Leg., 35th Leg., Reg. Sess. (Wash.1957). See RCW 49.60.040(10).
[86] See Washington's Law Against Discrimination, Laws of 1957, ch. 37, § 2.
[87] In re Johnson, 71 Wash.2d 245, 427 P.2d 968 (1967).
[88] See Washington State Human Rights Commission ex rel. Spangenberg v. Cheney Sch. Dist. No. 30, 97 Wash.2d 118, 126-28, 641 P.2d 163 (1982).
[89] See RCW 49.60.175; .176; .178; .222.
[90] Marquis, 130 Wash.2d at 109, 922 P.2d 43 (citing Mackay v. Acorn Custom Cabinetry, Inc., 127 Wash.2d 302, 309-10, 898 P.2d 284 (1995); Burnside v. Simpson Paper Co., 123 Wash.2d 93, 99, 864 P.2d 937 (1994)).
[91] Id. (citing Allison v. Hous. Auth., 118 Wash.2d 79, 86, 821 P.2d 34 (1991)).
[92] Mackay, 127 Wash.2d at 310, 898 P.2d 284.
[93] Marquis, 130 Wash.2d at 105-06, 922 P.2d 43.
[94] Laws 1973, ch. 141, § 1.
[95] RCW 49.60.020.
[96] Phillips v. City of Seattle, 111 Wash.2d 903, 908, 766 P.2d 1099 (1989).
[97] See OR.REV.STAT. 695A.403; MINN.STAT. 363 (excluding fraternal corporations if religious in nature); MD.CODE ANN. ART. 49B § 5.
[98] United States v. Trs. of Fraternal Order of Eagles, Milwaukee Aerie No. 137, 472 F.Supp. 1174 (E.D.Wis. 1979) (denying summary judgment motion on the basis that a factual issue existed as to whether the Fraternal Order of Eagles is a private club and therefore exempt from the Civil Rights Act of 1964 which excluded "a private club or other establishment not in fact open to the public)." Lahmann v. Grand Aerie of Fraternal Order of Eagles, 180 Or.App. 420, 43 P.3d 1130, review denied, 334 Or. 631, 54 P.3d 1041 (2002) (finding that the Public Accommodation Act applies to the Eagles' membership policy and remanding the case to determine if it is distinctly private in nature).
[99] U.S. Jaycees v. McClure, 305 N.W.2d 764 (Minn. 1981), (concluding the Jaycees organization was a public business); Rogers v. Intern'l. Assn. of Lions, 636 F.Supp. 1476, 1478-79 (E.D.Mich.1986).
[100] U.S. Jaycees v. McClure, 305 N.W.2d at 770 (citing Nesmith v. Young Men's Christian Ass'n. of Raleigh, N.C., 397 F.2d 96 (4th Cir.1968); Cornelius v. Benevolent Protective Order of Elks, 382 F.Supp. 1182 (D.Conn.1974); Wright v. Cork Club, 315 F.Supp. 1143 (S.D.Tex. 1970)).
[101] U.S. Jaycees v. McClure, 305 N.W.2d at 769-70; Rotary Club of Duarte v. Bd. of Dirs. of Rotary Int'l, 178 Cal.App.3d 1035, 224 Cal.Rptr. 213 (1986).
[102] Id.
[103] Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 546, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987); Roberts v. U.S. Jaycees, 468 U.S. 609, 620, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); Rogers v. Int'l Ass'n of Lions Clubs, 636 F.Supp. 1476, 1479 (E.D.Mich.1986); Trs. of Fraternal Order of Eagles, Milwaukee Aerie No. 137, 472 F.Supp. at 1175-76.
[104] See U.S. Jaycees v. McClure, 305 N.W.2d at 764 (Minn. 1981); Rotary Club of Duarte v. Bd. of Dirs. of Rotary Int'l, 178 Cal.App.3d 1035, 224 Cal.Rptr. 213, (1986), aff'd, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987).
[105] Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 542-43 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987).
[106] Id. at 543, 107 S.Ct. 1940.
[107] McClure, 305 N.W.2d at 772.
[108] 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987).
[109] Roberts, 468 U.S. at 620, 104 S.Ct. 3244.
[110] Rotary Club of Duarte, 481 U.S. at 537, 107 S.Ct. 1940; Roberts, 468 U.S. at 612, 104 S.Ct. 3244; Rogers, 636 F.Supp. at 1478; Trs. of Fraternal Order of Eagles, Milwaukee Aerie No. 137, 472 F.Supp. at 1175-76.
[111] See, e.g., Rotary Club of Duarte, 481 U.S. at 537, 107 S.Ct. 1940; Roberts, 468 U.S. at 616, 104 S.Ct. 3244; Rogers, 636 F.Supp. at 1478-79; Trustees of Fraternal Order of Eagles, Milwaukee Aerie No. 137, 472 F.Supp. at 1175-76; Lahmann, 180 Or.App. at 422, 43 P.3d 1130.
[112] McClure, 305 N.W.2d at 767.
[113] La. Debating & Literary Ass'n v. City of New Orleans, 42 F.3d 1483, 1494-95 (1995).
[114] Kiwanis Int'l v. Ridgewood Kiwanis Club, 806 F.2d 468, 473-74 (3d Cir.1986).
[115] Dezell v. Day Island Yacht Club, 796 F.2d 324, 329 (9th Cir.1986).
[116] Roberts, 468 U.S. at 620, 104 S.Ct. 3244.
[117] Id; Rogers, 636 F.Supp. at 1479 (citing Kiwanis Int'l v. Ridgewood Kiwanis Club, 627 F.Supp. 1381, 1388 (D.N.J.1986)).
[118] Rotary Club of Duarte, 481 U.S. at 537, 107 S.Ct. 1940; Roberts, 468 U.S. at 614, 104 S.Ct. 3244.
[119] Roberts, 468 U.S. at 621, 104 S.Ct. 3244.
[120] Rotary Club of Duarte, 481 U.S. at 546, 107 S.Ct. 1940.
[121] Id. at 546-47, 107 S.Ct. 1940.
[122] Fraternal Order of Eagles, Tenino Aerie No. 564, 108 Wash.App. at 217, 27 P.3d 1254.
[123] Id. The Court of Appeals did note that the WLAD applied to the organization when it acts like a public accommodation (e.g., holding public dances or renting facilities for events).
[124] Enter. Leasing, Inc. v. City of Tacoma, 139 Wash.2d 546, 551, 988 P.2d 961 (1999); Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982).
[125] Stokes v. Polley, 145 Wash.2d 341, 346, 37 P.3d 1211 (2001); CR 56.
[126] "`A material fact is one upon which the outcome of the litigation depends in whole or in part.'" Samis Land Co. v. City of Soap Lake, 143 Wash.2d 798, 803, 23 P.3d 477 (2001) (quoting Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co. 115 Wash.2d 506, 516, 799 P.2d 250 (1990)). The "distinctly private" factors serve as material facts because the outcome of the case relies on proving the factors favor one conclusion over the other.
[127] See Clerk's Papers at 759, 802-12.
[128] Clerk's Papers at 597, 928.
[129] Id. at 928.
[130] Id. at 596.
[131] RCW 49.60.010.
[132] See RCW 49.60.020, .040(10).
[133] RAP 18.1(j).
[1] Courts may add or subtract provisions only when it is "certain that the legislature could not possibly have intended the words to be in the statute, and that the rejection of them serves merely as a correction of careless language and actually gives the true intention of the legislature." Applied Indus. Materials Corp. v. Melton, 74 Wash.App. 73, 78 n. 11, 872 P.2d 87 (1994). Here we have no evidence suggesting inclusion of the phrase "including fraternal organizations" in RCW 49.60.040(10) was the result of careless drafting on the part of the legislature. Nor is there any other concrete evidence to suggest that phrase is unnecessary. Cf. Wash. Water Power Co. v. Graybar Elec. Co., 112 Wn.2d 847, 859, 774 P.2d 1199, 779 P.2d 697 (1989) (suggesting statutory phrases may be ignored when they are "mere surplusage").